I'm going to try to reserve three minutes for rebuttal. I'd like to focus on two issues today. First, whether the boundaries of a wildlife sanctuary subject to a conservation easement for the benefit of the public are a matter of public interest. And second, whether the landowners have shown any respect for the rights of the public. I think the resolution of those two issues makes clear that the landowner's deceit claim is a meritless attempt to punish Audubon for the exercise of its free speech rights as a public steward. And therefore, the anti-SLAPP statute is the proper vehicle for resolving this dispute without any further incurrence of liability. Breyer. For me, it's hard to see this as anything other than a boundary line dispute. Well, the boundaries of the sanctuary are coextensive with the Forever Wild easement. And the Forever Wild easement was granted pursuant to Government Code 65560 to preserve the open space for the benefit of the people of Sonoma. Government Code's — Did you file the SLAPP motion only with regard to the deceit? No, we filed the SLAPP motion with respect to all three of the claims. All right. And there was a disparagement of title claim. There was a slander of title claim as well. And what happened to that one? The slander of title claim, the Court denied the anti-SLAPP motion, but then granted summary judgment for the National Audubon Society in a summary judgment motion that we filed alongside the anti-SLAPP motion. So the only issue right now in terms of the anti-SLAPP order is this deceit claim. And the deceit claim is clearly about Audubon's statements about the boundary. And there were statements made to the group of homeowners, right? There were statements made to a group of homeowners. But, I mean, the California Supreme Court has repeatedly rejected the notion that the anti-SLAPP statute does not extend to activity transpiring between private individuals. That's Briggs. That's Navier. That's just a well-established conclusion. So it was to those people, but it was about an issue of public interest. California Government Code 65561B specifically says that the preservation of open space is, and I quote, a matter of public interest. Well, was this about the preservation of open space? Yes, because the boundaries of the sanctuary are co-extensive with that forever wild easement. And the forever wild easement essentially is the sanctuary. It's on top of it. So when we need to back up for me and explain, at least for my benefit, what the whole why the Audubon Society undertook these surveys. Audubon undertook the surveys because when they were, when they were essentially this land came into their possession through a donation, they had, they, it came with the forever wild easement. And they had determined the scope of that land to make sure that they were abiding by the very restrictive measures of the forever wild easement, because they're not allowed to divide, subdivide, or de facto subdivide the land, any actions that they take on the land. They have to seek approval from a government agency. And did they think, were they under the impression that their boundary, that the boundary line sort of seeped over into the property owners? Yeah. They hired a, they hired a survey to make sure they understood what their obligations were under the forever wild easement. And that survey in 1999 said, look, it looks like we have a discrepancy here between the dependent government, the dependent resurvey that the government did in 1975 and the fence lines. And so there was that dispute existing at that point. In the meantime, between 1999, when they first got this news, and the time that these meetings with the plaintiffs occurred, there was actually another lawsuit about the sanctuary in which a citizen went ahead and sued to enjoin a public utility easement, claiming that it conflicted with the public's interest under the forever wild easement, which shows that this is a matter of public interest. So when they then rehired the surveyor to go ahead and continue along with the case, they said, you know what, you go ahead and you place any monuments or you complete this survey, give us the preliminary results, because we told the landowners that we would give them those preliminary results. And that's when these meetings occurred, to give them the preliminary results. And the landowners claimed that there were various misrepresentations during those meetings. So, you know, all of this was very much in connection with an issue of public interest, that issue of public interest being the forever wild easement and the boundary of the sanctuary, which is coextensive therewith. Sotomayor, but does the case law suggest that the public interest has to actually be something that the public is interested in? Gershengorn Certainly. And here we have by statute that the public is interested in this, and we have a lawsuit. Sotomayor But we have no evidence that anybody cared about it. Gershengorn Oh, we had a lawsuit just about 5 years before this dispute arose in which a public citizen sued to enjoin a public utility easement over the sanctuary, because he said that conflicts with the forever wild easement. Sotomayor That's not this dispute. Gershengorn That's not this particular dispute, but it shows that that just reinforces  Sotomayor Well, that was the use of the actual existing wild space. But here the question is, does a space end here or does a space end there? Gershengorn Right. Sotomayor And yes. Gershengorn Yeah. The people of Sonoma are the ones who benefit from that open space. This is all expressly for the people of Sonoma. So they absolutely have a public interest in that. There absolutely is a public interest in what this open space consists of, because it was put there, it was purchased by the county of Sonoma for the public benefit. That's how this works. Sotomayor Would the grant of your anti-slap motion mean that your client could put this property boundary anywhere they wanted? Gershengorn Not at all. Because after this dispute arose, the landowners pretty much immediately Sotomayor What would be the result if your motion had been granted? Gershengorn If our motion had been granted, this dispute would have been dismissed. Sotomayor The lawsuit would have been dismissed. Gershengorn The lawsuit would have been dismissed, but we had already entered boundary line agreements which set the boundaries at the fence lines, which is all the landowners wanted in the first place in this boundary dispute. We went ahead and clicked. Autobahn wanted no part of this. We're a nonprofit organization that is just trying to conserve the land. And all Autobahn wanted to do was end this dispute. So in February 2008, we quit claimed any interest in these disputed lands to the plaintiffs. We said we'll do that. Then the boundary line disputes were recorded early in 2010. And then a year and a half later, we find a lawsuit on our doorstep saying, you know, slander of title, millions of dollars for attorney's fees and expenses that have been incurred in the meantime. Sotomayor So what happens on the deceit claim, which is still alive, right? Gershengorn Right. So if this Court was to reverse the anti-SLAPP order, essentially denying the anti-SLAPP motion as to the deceit claim, then the deceit claim would be gone. If you grant the anti-SLAPP, if you say the Court should have granted the anti-SLAPP motion, then the deceit claim goes away. And then you have, you know, these other three claims, which the Court already found summary judgment in Autobahn's favor on, and the dispute goes away, and there doesn't have to be any more incurrence of unnecessary attorney's fees and expenses, which, as we know from the second prong of the anti-SLAPP statute, is all that's really at issue here. Sotomayor Is it your client's position, if we can set the anti-SLAPP aside for just a second, that we don't, that this panel doesn't have jurisdiction over the cross appeal because there are still live issues? Gershengorn No, there are no live issues on that. I don't think this Court has jurisdiction, pendant jurisdiction over the cross appeal unless it concludes on our appeal that the denial of the anti-SLAPP motion as the deceit claim should be reversed. But otherwise, those claims are not inextricably intertwined. You know, consideration of their merits is not necessary to resolve it. Breyer What's that? They're separate considerations. Gershengorn They are separate considerations. The only reason to get to the cross appeal is, if you agree with us, that the anti-SLAPP or the deceit claim should be reversed. Kagan Why would we get to the cross appeal then? Why are they more or less intertwined, depending on which way we come at it? Gershengorn Well, just because then all that would be left, well, there would be nothing left at that point, because if you were simply going to reverse and say you should have granted the anti-SLAPP order as the deceit claim, and because the Court has already entered judgment. Kagan But there is not, in fact, a final judgment, and there's still interlocutory appeals that are not connected to the substance of the SLAPP motion. Gershengorn Right. And that's why I'm saying, if the Court concludes the deceit claim should have been resolved in Audubon's favor, then, yes, it should go ahead and reach the cross appeal. Kagan But I don't understand why, because there's still, we still don't have jurisdiction  Gershengorn Okay. Purely out of judicial economy. Otherwise, you just send them back down, the Court enters judgment, and they come right back up, and we wait another two years to get this resolved. That would be the pure reason for doing that. I understand you guys would have discretion as to that, and that's understandable. I just think, as a matter of putting this entire dispute behind us, that if you find for Audubon the deceit claim. Kagan Well, we don't have jurisdiction if there's no jurisdiction over those issues, and I don't understand how there's a one-way ratchet whether there's jurisdiction over them. I take the point. I do. Scalia Just one comment on your argument. I would hope that the Court would be entitled to more respect than simply being referred to as new guys. Kagan I apologize. That's my informality, and, Your Honors, I greatly apologize for saying that. Scalia Nothing humorous about my comment. Nothing. Kagan I apologize. So moving on to the second prong of the anti-SLAPP statute, the question becomes, have they proven any recoverable damages? Because although Audubon believes that they would not be able to prevail on any elements of the deceit claim, such as misrepresentation, justifiable reliance, all you have to show is that they don't prevail on one. They haven't shown any recoverable damages. Kagan I don't really. First of all, it seems like there is a trend in California case law. It seems like there's a trend in the California case law to allowing at least the expert fees under circumstances like this. I mean, if somebody, I mean, basically this is what happened. You come to them and you say, you know, you have a fence up there, and the fence is in the wrong place, and we want you to move the fence and give us the other property, right, because it's really ours. Not give it to us. It's ours. So move your fence. So they have to decide whether to move the fence. How is that different than repairing a building, right? So in order to figure out whether to move the fence, they go and they hire their own surveyor. Let's leave the fees out, the attorney's fees out of it for the moment, because we, at least for this purpose, it doesn't matter. There has to be some damages, right? So how can they not be entitled in order to decide what to do next, not for litigation, but should I move the fence? Right. I don't think we can leave the attorneys out of this because the first, because the first interaction that you had after the meetings was between attorneys. But they still, in order to figure out what to do next, i.e., move the fence, needed a survey, right? I disagree, because the attorney said in his letter essentially asserted adverse possession. You don't need a surveyor to determine adverse possession. Well, that was one position, but the other position is whether, why did they do the survey? Pardon? Why did they do the survey? Why did Audubon do the survey or why did the landowners? Why did the landowners do the survey? Why the landowners did the survey, I. . . It's not clear that they actually did a survey. They brought in consultants. They ultimately. Did they ultimately do the survey? They ultimately did a survey, and that survey wasn't recorded in February 2010, two years after we had already, Audubon had already said, well, quit claiming the disputed lands. So that's when the survey was finally done. I don't know why they kept doing the survey. They didn't have any expert fees before that just to say what should we do? None on the record. There's none on the record of any expert fees before that point. I thought they had a consultant, Casper or somebody like that. Carlson, I believe the name was. But in terms of that happening before they hired the attorneys and being not at the behest of the attorneys, there's no record of that at all. I don't see why the before or after. Was it before you quit claimed? We quit claimed in February. We said we will settle this boundary dispute by quit claiming in February of 2008. I'm not aware of any evidence on the record about a surveyor prior to that point. All right. And what about the evidence of emotional distress and all that? Well, emotional distress shouldn't be at issue here on the deceit claim at all, because they agreed in the district court that you have to show pecuniary harm. And they can't. And they don't argue on a P-line. So the problem is that they still need some pecuniary harm. They still need some pecuniary harm. And what they have is attorneys' fees and related expert fees, which are barred by the American rule. And then they have just this sort of nebulous lost time. But even their case law, the Sutter case, makes clear that you need to have some sort of specific business opportunity that you've foregone in reliance on the alleged misrepresentation. I'm at two minutes left. I'm happy to keep answering questions, but thank you. Roberts. David. Good afternoon, Your Honors. May it please the Court. My name is Richard Wallace, and I have the pleasure and privilege of representing the plaintiffs, the appellees, and the cross-appellants, some of whom have joined us in the courtroom today and are sitting behind me. There are four issues really in front of us, and I have limited time. So subject to the Court's questions and concerns, I would like to deal with them in this order. The first is the district court's correct ruling on the first prong of anti-SLAPP. The Court got it right. And if this Court affirms on that basis, then that's really the end of the inquiry. You referenced judicial — I'm sorry, jurisdictional issues. Those are of, we think, significance, given the complexities that arise from anti-SLAPP review, and we certainly are aware of the dialogue that's gone on among the Court about jurisdiction when there is anti-SLAPP. If the Court is inclined to grant or to review the summary judgment decisions, which are partial summary judgment, it's interlocutory, and they're the only decisions on the merits here, which typically would not be reviewable, then I would like to address some of the comments about damages, specifically my client's damages and the substantiation of those damages, and particularly in regard to some of the misstatements that we just heard from Mr. Silvera, and also some of the misstatements in the reply brief. Sotomayor did not certify these questions that relate to your client's action for interlocutory  That's exactly correct, Your Honor. Nor did either side ask? That's correct. And the final point is that if we — if the Court is inclined to grant jurisdiction over the rulings regarding summary judgment, then we also would like review of the I don't understand what — it was characterized by your opponent as discretionary. I don't understand why it's discretionary, i.e., I don't know that we have discretion to do that. I — excuse me — I tend to agree that it's not discretionary. I think there's either — excuse me — there's either pendent jurisdiction or there's not, Your Honor. And, in fact, we — we submit there is no pendent jurisdiction at all over the district court's ruling on the merits, because the merits were entirely — it's really — except with regard to the privilege issue, which related to the first prong of the anti-SLAPP, where the Court found that, in fact, there is evidence of malice on the part of Audubon here, which overcomes the privilege, there were no other rulings on the merits except in the context of the summary judgment motions. And those are partial summary judgment rulings. And I agree, Your Honor, that they're derogatory. And actually, we're really here just on the first prong of anti-SLAPP. Roberts, we've now gone down three minutes, so. Thank you, Your Honor, yes. I would like to start by commenting on one of the comments that Mr. Severa made. And he pointed to the fact that the Audubon eventually, in 2010, agreed to a resolution of the claims that they were making against our client's property, the claims that they made with doctored maps, with lies to our clients about the effect of those maps and the options that were in front of Audubon in terms of taking possession of our client's property. The evidence in the record, and this is at the supplemental excerpt of record, page 277 and 278, substantiates the fact that Audubon would not have agreed to that resolution in 2010 unless and until our clients incurred the substantial expenses to disprove the claims of Audubon in their property that were built, in fact, on these lies, the deceit, the doctrining of maps, the misrepresentations of what the surveyor would say in relation to these maps. That sounds like that relates to the second prong of the SLAPP inquiry. Well, I only bring it up because of the first prong. Yes, and I'll – thank you, Your Honor. I'll get to that. So as far as the first prong goes, the – Audubon's position basically is that it collapses the entire anti-SLAPP analysis into the position that it's entitled to lie and cheat and attempt to defraud our clients of their property because it's a conservation organization and its deceitful tactics, if successful. No, it's not. You have the whole structure of this wrong. All the first prong does is act as a screen. You still get to the question of whether or not there's a potentially viable lawsuit nonetheless. Just because there's protected First Amendment interest doesn't – you can't – if you start collapsing it that way, you've eliminated the second prong. So no one's saying they have a right to cheat and so on. If they're cheated and lied and so on, you could still have a viable cause of action. That's not the question. And that's correct. But what I was leading up to, Your Honor – I'm sorry, I didn't get it. We weren't leading up to it because, in fact, you said you were discussing the first prong, and the first prong is just does this get in the door. Right. And that's what I'm leading up to. The fact that they're a conservation organization and that the – Doesn't get them in the door. It doesn't get them in the door. That's correct. Or the fact that it relates to a conservation area. And that's correct. And that's the whole point. Because, as you alluded to earlier, the focus of the inquiry under the first prong is the nature of the specific activity that gave rise to the plaintiff's complaint here. Well, the specific activity does deal with talking. It's different, for example, from the case that you rely on where there was a strictly a property – the church case where there was strictly a property dispute. There wasn't any talking going on in it. This is about making a cause of action out of something they said, basically. Right? That's correct, Your Honor. But the activity is what they did. It's not just what they said. The activity is their conduct, and their conduct was their deceit and their fraudulent conduct in trying to take our client's land. It seems to me that you don't get anywhere with that theory because, in fact, it was attaching – you were trying to make a cause of action out of speech. The question is, was it speech about public interest? That's the question. Not whether it was speech. It was speech. That's right. The conduct has to be in furtherance of the constitutional right of free speech and in connection with a public issue or an issue of public interest. And that's the point. The speech here was about the speech, whatever it is. The conduct was about taking or trying to take our client's land built upon this whole mountain of deceit and lies. It was not about conservation. It was not about the issue of conservation. We're not challenging Audubon's right to advocate conservation. We're not advocating – sorry, we're not challenging its right to raise money for its efforts. The issue is not – the speech is not about the issue of conservation here. The conduct is about fraud and deceit in trying to take somebody's property, our client's property, wrongfully. The world kind of – Well, I guess Audubon's position is essentially that their motive, that they essentially had no choice given the public interest in this land but to pursue this. But that doesn't mean they had a right to – they had an obligation to pursue it fraudulently, but they had an obligation to pursue it. So they would say, well, there is a public interest in what we were saying even if we were lying. That is their argument. Their argument is that they were motivated by the forever wild easement. But motive is not a factor in the anti-SLAPP analysis of the first prong. You take motive out of the equation. Property owners could have any number of motives for asserting a right in somebody else's land. Our families have hunted there for generations, whatever. There's a well on the other property that we've been using all these years, and we therefore have a right, property rights in that land by virtue of that well. There can be any number of motives for a deceitful attempt to take somebody else's land, but the motive is not – the motive is not a factor here. The factor, the focus is on, again, on the specific activity that gave rise to plaintiff's claims. And here it has nothing to do with conservation. The fact that the boundary of these properties bounds a property, bounds land that is subject to a conservation easement, doesn't change the underlying nature of the dispute. You brought up the Episcopal Church case. That's a great example for us. Kagan. No, it's completely different because there the underlying tort was not about the speech. Well, there are other cases. Well, it turned on the fact that it wasn't about speech, not on the fact that it wasn't a public interest. But again, it's the conduct itself, and the World Financial case specifies that the focus is not on society's general interest in the subject matter of the dispute. And that's what they're arguing, that the society had a general interest in the subject matter of this dispute because their boundary bounded conservation property. But that's not the analysis. The only reason why I brought up the Episcopal Church case is because if you take the subject activity out of the equation that is allegedly protected, there it was, the ordaining of gays as bishops, the claim is still the same. It's still property dispute. It's absolutely the same claim. And we have the same situation here. If you take the conservation issue, the fact that some of the property was subject to a conservation easement out of the equation here, it's exactly the same dispute. It's a dispute between two neighbors over their property, and one of those neighbors attempt to take the other neighbor's land. That's distinct from the, for example, the Save the Westwood Village case that Audubon cited in their Rule 28J filing. In that case, if you take the protected activity out of the equation, in that case it was contributions to UCLA, there is no longer a claim against the defendants, in that case the foundation and the individual donors of that foundation. So again, the emphasis, the focus has got to be on the specific activity. And as you mentioned earlier when Mr. Severo was speaking, the activity here is a property dispute. It's a dispute between two property owners, one of which engaged in deceitful And that conduct was not on the issue of conservation. It was not on the issue. So let's assume your time is just about running out now. So let's assume that Audubon gets over the first prong of the analysis. So they went out on the second prong, that is. And they say you can't, there's no way the landowners can prevail here because they suffered no damages. So there's, the motion should have been granted. Right. Well, as I. What are the damages? Well, let me break that down into two parts, and you're right, I'm running out of time. But again, the Court has to get over the issue of jurisdiction, whether it can even consider the summary judgment rulings here. But if it does. On the second prong, we can deal with the second prong of the anti-SLAPP motion without, just put the summary judgment stuff aside. But as to the second prong, there's two answers to that. One is, first of all, the first answer is that regardless of the expenses of the legal advice that were required here to disprove these claims of Audubon against our property's land, there were other cognizable damages. Or to unravel the claim deceit. Yes. There were other cognizable damages. The, and we've, there's evidence of that that's in the record. Apart from attorney fees, what do you rely on? Our plaintiffs will have increased costs of construction when they actually can begin construction here. They'll have increased costs of construction. They have the value of their time that's lost. Our clients have spreadsheets, massive spreadsheets chronicling this time. Interestingly enough, however, Audubon did not raise the issue of damages below in the district court. And having not raised the issue of out-of-pocket damages below, I really don't think they're entitled to raise them here. Below, their claims on the deceit claim were limited to their position that our clients, that Audubon, rather, had not made misrepresentations or if they had, our clients had not reasonably relied on them. The district court, in reviewing the elements of deceit, raised the issue of damages and in the limited context of the investigative expenses that our clients occurred or incurred to disprove Audubon's claims. But that, that doesn't mean that the district court discredited the other damages as Audubon asserts in its papers. It just was merely focused on the investigative expenses. I think I need to focus on those for a moment. The investigative expenses. Again, and the reason why I wanted to bring up right away the issue of Audubon, this memo, this internal e-mail amongst Audubon, it substantiates that Audubon would not have agreed to affirm the boundaries in their historical locations where they had always been, which was the ultimate. Sotomayor, you have 40 seconds to give Judge Paez a list that he asked for. The investigative expenses. The damages include, colon. The damages include. The cost to the increased cost to rebuild. The time, our plaintiff's time, both of which are cognizable out-of-pocket expenses under Civil Code 333. The investigative expenses. And all I asked you, what were they? Yes. And the costs of Ray Carlson and Larry Heider to come in and do the historical research to disprove. But when did they do that? They did that before 2008, Your Honor. They, Mr. Silveira intimated that the only survey is the one in 2010. That was a record of survey that was done after, after this was resolved. Roberts. Okay. You're over your time. Thank you. Thank you very much. We appreciate your argument. We have a little bit of time on rebuttal. Thank you, Your Honors, for listening to me again. Just really quickly on the point about Audubon never would have resolved this thing, and that's shown from, as you said, the record site was SER 27778. That's a letter from 2007. The question is whether it was a legitimate expense at the time it was incurred for the purpose of them determining what they had to do next. Right. And I continue to say that it was not a legitimate expense, because if we're dealing with real life cases. What about the other expenses? What about the time, the time value of the land? There's zero cases that say that, there are zero cases that say that you can just say lost time trying to resolve this dispute. I'm entitled to it. What about loss of value in the land or increased cost in building? There's no evidence of that in the record at all. They simply assert there's a lost use of property. But in fact, and this is more important. Fair guess. What's that? Pretty good guess. I don't think it is a good guess when you consider the fact that Audubon never occupied the land. That land was always fenced in by. They weren't going to build on it if their houses were going to get ripped down. As of February 2008, Audubon had said we're quit claiming that disputed land to you. So I don't think we have anything there. Adverse possession is what they based their letter on. And that. On the second prong of the SLAPP inquiry before the district court, did you raise that they couldn't prove damages? Yes, absolutely. That was very much in there. We cite the express case. But he's wrong when he just stood up here and said that he didn't. Yes, when he says that we didn't raise damages, no. We said that they can't prove any of the elements of a deceit claim, including damages. And that's what, you know, the base of our appeal was. The district court did say something about it, although not much. Yeah, absolutely. This was very much damages were a part of this analysis. And he didn't raise in the appeal briefing at any point that damages were not raised below. That's been part of this throughout this entire time. In terms of this notion that I know that Judge Berzon, you mentioned that if they would need to hire a surveyor to go ahead and figure out where to, you know, to move a fence. But that's different from a builder. The builder, if you hire a builder to move the fence, that's more similar to Gorman and Stearman in these sorts of cases. That's a different thing. And then finally. This is your last comment. Thank you, Your Honors, for hearing from us today. Okay. Thank you. Thank you, counsel. We appreciate your arguments this morning. The matter is submitted and that ends our session for today. All rise. This Court, for this session, stands adjourned.
judges: Hawkins, Paez, Berzon